FILED

10 FEB 22 PM 3: 45

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

COPY

BY:

1  GLANCY BINKOW & GOLDBERG LLP
   Michael Goldberg (SBN 188669)
2  1801 Avenue of the Stars, Suite 311
   Los Angeles, CA 90067
3  Email: info@glancylaw.com
   Tel: (310) 201-9150
4  Fax: (310) 201-9160

5  SAXENA WHITE P.A.
   Maya Saxena
6  Joseph E. White, III
   Lester Hooker (SBN 241590)
7  2424 North Federal Highway, Suite 257
   Boca Raton, Florida 33431
8  Tel: 561-394-3399
   Fax: 561-394-3382
9
   *Attorneys for Plaintiff Emilio Gerov*
10 [Additional Counsel on Signature Page]

11          **UNITED STATES DISTRICT COURT**

12          **CENTRAL DISTRICT OF CALIFORNIA**

13
   EMILIO GEROV, Derivatively, on Behalf      No. SACV 10-00220-DOC(ANx)
14 of Nominal Defendant STEC, INC.,

15              Plaintiff,                     **VERIFIED SHAREHOLDER
                                              DERIVATIVE COMPLAINT**
16              vs.

17 MANOUCH MOSHAYEDI, MERHDAD                 JURY TRIAL DEMANDED
   MOSHAYEDI, RAJAT BAHRI, F.
18 MICHAEL BALL, CHRISTOPHER W.
   COLPITTS, DAN MOSES, MATTHEW
19 WITTE,

20              Defendants,

21              and

22 STEC, INC.,

23              Nominal Defendant.

24
25      Plaintiff, by his undersigned attorneys, brings this action derivatively on

26 behalf of nominal defendant, STEC, Inc. ("STEC" or the "Company") and alleges

27 upon personal knowledge as to himself and his own acts, and as to all other matters

28 upon information and belief, as follows:

1
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of STEC on behalf of the Company against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Defendants' breaches of fiduciary duties and unjust enrichment.

2.     Defendants' wrongful course of conduct, as described herein, has exposed the Company to civil and criminal liability and caused substantial losses to STEC, including the loss of its reputation and goodwill.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and each Defendant, and the amount in controversy exceeds $75,000.  STEC is a California corporation with headquarters in Santa Ana, California.   Plaintiff is a resident of Venezuela. Defendants are believed to be residents of California.

4.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.   This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

5.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more Defendant either resides in or maintains executive offices in this district, Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district, and STEC is headquartered in this district.

**PARTIES**

6.      Plaintiff Emilio Gerov is a resident of Venezuela, is a current shareholder of STEC, and has been a shareholder of the Company during the Relevant Period.

7.      Nominal Defendant STEC is a corporation incorporated under the laws of the State of California and is headquartered in Santa Ana, California.  According to its public filings with the SEC, STEC designs, manufactures and markets high performance data storage solutions.

8.      Defendant Manouch Moshayedi ("Manouch) was, at all relevant times, Chief Executive Officer ("CEO") of STEC and has served as Chairman of the Board of Directors since the Company's inception in 1990.  Manouch is the brother of Mehrdad Moshayedi and is believed to be a resident of California.

9.      Defendant Merhdad Moshayedi ("Merhdad") was, at all relevant times, STEC's Chief Operating Officer ("COO"), Chief Technical Officer ("CTO"), President and a Director.  Mehrdad is the brother of Manouch and is believed to be a resident of California.

10.     Defendant Dan Moses ("Moses") served as STEC's Chief Financial Officer from August 1994 to November 2008, and was Executive Vice President from August 2006 to November 2008.  Moses was STEC's Controller from October 1992 to August 1994.  Moses has served as a Director since March 2000.

11.     Defendant Matthew L. Witte ("Witte") has served as a Director of STEC and a member of STEC's Audit, Compensation, Nominating and Corporate Governance committees since January 2009.

12.     Defendant Rajat Bahri ("Bahri") has served as a Director of STEC and a member of the Compensation Committee, Nominating and Corporate Governance Committee and Audit Committee (of which he is Chairman) since November 2005.

13.     Defendant F. Michael Ball ("Ball") has served as a Director of STEC, a member of the Audit Committee, and a member of the Compensation Committee (of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

which he is Chairman) since October 2000.  Ball was also appointed a member of STEC's Nominating and Corporate Governance Committee in February 2004.

14.    Defendant Christopher W. Colpitts ("Colpitts") has served as a Director of STEC since March 2009 and is currently a member of the Compensation Committee.

15.    Collectively, Defendants Manouch, Bahri, Ball, Colpitts, Moses, Merhdad, and Witte will be referred to herein as "Individual Defendants." Defendants Bahri, Ball, and Witte will be referred to herein as "Audit Committee Defendants."  Defendants Ball, Bahri, Witte, and Colpitts will be referred to herein as "Compensation Committee Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

16.    By reason of their positions as officers and directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

17.    Each director and officer owes to STEC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts

1    so that the market price of the Company's stock would be based on truthful and
2    accurate information.

3        18.    The Individual Defendants, because of their positions of control and
4    authority as directors and/or officers of STEC, were able to and did, directly and/or
5    indirectly, exercise control over the wrongful acts complained of herein, as well as
6    the contents of the various public statements issued by the Company.  Because of
7    their executive, managerial and directorial positions with STEC, each of the
8    Individual Defendants had access to adverse, non-public information about the
9    financial condition, operations, and improper representations of STEC.

10        19.    At all times relevant hereto, each of the Individual Defendants was the
11    agent of the other Individual Defendant and of STEC, and was at all times acting
12    within the course and scope of such agency.

13        20.    To discharge their duties, STEC's officers and directors were required
14    to exercise reasonable and prudent supervision over the Company's management,
15    policies, practices and financial affairs.  By virtue of such duties, STEC's officers
16    and directors were required to, among other things:

17        a.    Manage, conduct, supervise and direct STEC's business affairs
18    in accordance with all applicable laws (including federal and state laws, government
19    rules and regulations and the Company's charter and bylaws);

20        b.    Neither violate nor knowingly permit any officer, director or
21    employee to violate applicable laws, rules and regulations;

22        c.    Establish and maintain systematic and accurate records, business
23    reports, and procedures for reporting to the Board and to periodically investigate, or
24    cause independent investigation to be made of, said reports and records;

25        d.    Neither engage in self-dealing nor knowingly permit any officer,
26    director or STEC employee to engage in self-dealing;

27        e.    Ensure that the Company complied with its legal obligations and
28    requirements, including acting only within the scope of its legal authority and

disseminating truthful and accurate statements to the Securities and Exchange Commission ("SEC") and the investing public;

f.     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.     Remain informed as to how STEC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, to take steps to correct such conditions or practices, and to make such disclosures as necessary to comply with federal and state laws.

21.     Each Individual Defendant, by virtue of his or her position as a director and officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a violation of their obligations as directors and officers of STEC, the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders, such that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the

1  Company has been ratified by the remaining Director Defendants who collectively

2  comprised all of STEC's Board during the Relevant Period.

3      22.    The Individual Defendants breached their duties of loyalty and good

4  faith by allowing Defendants to cause, or by themselves having caused, the

5  Company to misrepresent its financial results and prospects, as detailed herein, and

6  by having failed to prevent employees and/or officers of the Company from taking

7  such illegal actions.  In addition, the Company is now the subject of class action

8  litigation alleging violations of federal securities laws.  This necessitates the

9  Company incurring excess costs arising from the Individual Defendants' wrongful

10  course of conduct.

11      23.    The Individual Defendants were responsible for maintaining and

12  establishing adequate internal accounting controls for the Company and ensuring

13  that the Company's financial statements were based on accurate financial

14  information.  According to generally accepted accounting principles ("GAAP") and

15  SEC rules, to accomplish the objectives of accurately recording, processing,

16  summarizing, and reporting financial data, a corporation must establish an internal

17  accounting control structure.  Among other things, the Individual Defendants were

18  required to:

19      a.    Make and keep books, records, and accounts, which, in

20  reasonable detail, accurately and fairly reflected the transactions and dispositions of

21  the assets of the issuer; and

22      b.    Devise and maintain a system of internal accounting controls

23  sufficient to provide reasonable assurances that:

24      (i)    Transactions were executed in accordance with

25      management's general or specific authorization; and

26      (ii)    Transactions were recorded as necessary to permit

27      preparation of financial statements in conformity with

28      GAAP.

24. Moreover, STEC's Audit Committee Charter provides that the Audit Committee should, among other things:

a. Develop and maintain free and open means of communication with the Board, the Company's Independent Auditor, the Company's internal auditors, if any, and the Company's financial and general management;

b. Perform any other activities as the Committee deems appropriate, or as are requested by the Board, consistent with this Charter, the Company's bylaws and applicable laws and regulations;

c. Conduct an annual self-evaluation of the Committee's performance, including its effectiveness and compliance with the Charter;

d. Review and reassess, at least annually, the adequacy of the Charter and submit any recommended changes to the Board for its consideration;

e. Report its findings regularly to the Board, including any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, and the performance and independence of the Company's Independent Auditor;

f. Review, discuss, and approve, prior to any public disclosure thereof, earnings press releases, financial information and earnings guidance;

g. Review and discuss with management and the Independent Auditor the annual and quarterly financial statements prior to their filing, including the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and a discussion with the Independent Auditor:

(i) All significant matters related to the Independent Auditor's review of the financial statements; and

(ii) The matters required to be communicated by applicable Statements of Auditing Standards, including, but not

1       limited to, Statement on Auditing Standards No. 61, as
2       modified or supplemented;

3       h.      Make a recommendation to the Board regarding the inclusion of
4  the audited annual financial statements in the Company's Annual Report on Form
5  10-K to be filed with the SEC;

6       i.      Prepare a report from the Committee to be included in the
7  Company's proxy statement related to the performance of certain Committee
8  responsibilities, as required by SEC rules and regulations;

9       j.      Consider and review with management, the Chief Financial
10  Officer and/or the Controller, and the Independent Auditor:

11          (i)      Significant findings during the year, including the status of
12                   previous audit recommendations;

13          (ii)     Any audit problems or difficulties encountered in the
14                   course of audit work including any restrictions on the
15                   scope of activities or access to required information;

16          (iii)    Any changes required in the planned scope of the audit
17                   plan;

18          (iv)     The overall scope and plans for the audit (including the
19                   audit budget and the adequacy of compensation and
20                   staffing); and

21          (v)      The coordination of audit efforts to monitor completeness
22                   of coverage, reduction of redundant efforts, and the
23                   effective use of audit resources;

24       k.      Review and discuss periodically with management and the
25  Independent Auditor:

26          (i)      The adequacy and effectiveness of the Company's internal
27                   controls over financial reporting and disclosure controls
28                   and procedures, including the review before its release, the

disclosure regarding the system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the Independent Auditor relating to such disclosure;

(ii) All significant deficiencies in the design or operation of the Company's internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data;

(iii) The integrity of financial reporting processes;

(iv) Any fraud, whether or not material, involving management or other employees who have a significant role in the Company's internal controls; and

(v) The adequacy of risk management programs and policies, including recommendations for any improvements in these areas;

l. Meet periodically with management, internal auditors, if any, and the Independent Auditor in separate executive sessions to discuss matters which the Committee or these groups believe should be discussed privately; and

m. Review the Company's financial, investment and risk management policies followed in operation of business activities.

25. Furthermore, Individual Defendants acknowledged their ethical and fiduciary obligations to the Company and its shareholders when the Company adopted a Code of Conduct (last revised on November 14, 2008), that served as the Company's corporate ethics and compliance program to which board members, executive officers, and employees are subject.

26. According to the introductory paragraph of the Code of Conduct:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

This Code of Business Conduct and Ethics has been adopted by our Board of Directors to help ensure compliance with legal and ethical requirements and our standards of business conduct. All Company Board members, executive officers and employees are expected to read and understand this Code of Business Conduct and Ethics, uphold these standards in day-to-day activities, comply with all applicable policies and procedures and ensure that all agents and contractors are aware of, understand and adhere to these standards. Further, because the principles described in this Code of Business Conduct and Ethics are general in nature, you should also review all applicable Company policies and procedures for more specific instruction, and contact the Legal Department or the Audit Committee if you have any questions. The Company will take appropriate action against any Board member, executive officer, or employee whose actions are found to violate these policies or any other policies of the Company, including immediate termination of employment or business relationship at the Company's sole discretion.

27.     Also, according to the Code of Conduct's section on payment practices: "False or misleading accounting entries, unrecorded funds or assets, or payments without appropriate supporting documentation and approval are strictly prohibited and violate Company policy and the law."

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

28.     In committing the wrongful acts alleged herein, Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

29.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did:

a.     Conceal that the Company was misrepresenting its financial results in order to allow Defendants to artificially inflate the price of the Company's shares;

b.    Maintain the Individual Defendants' executive and directorial positions at STEC and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and

c.    Deceive the investing public, including Company shareholders, regarding: the Individual Defendants' management of STEC's operations, the Company's financial health and stability, and future business prospects specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.

33.    In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

34.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least June 16, 2009, and continuing to the present.  During this time, the Individual Defendants caused the Company to conceal that STEC was misrepresenting its financial results and violating federal and state securities laws.  In addition, the Individual Defendants also made other specific, false statements about STEC's financial performance and future business prospects, as alleged herein.

35.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' breaches of fiduciary duty, abuse of control, gross mismanagement, insider trading, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of STEC's common stock so they could: (i) sell their individual holdings for a net transaction price of over $267 million (prior to the subtraction of offering expenses), and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result.

36.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the Board's authority, each Individual Defendant was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

37.     Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

38.     On June 16, 2009, STEC issued the following press release which was also filed as an 8-K with the SEC:

> SANTA ANA, CALIF., June 16, 2009 — STEC, Inc. (Nasdaq: STEC), today announced that based on the Company's preliminary review of its anticipated financial performance, it is increasing its guidance for the second quarter of 2009.
>
> The Company expects to report Non-GAAP diluted earnings per share in the range of $0.32 to $0.36, versus the previous guidance of $0.20 to $0.22 per diluted share announced on May 11, 2009.
> The Company also expects to report revenue in the range of $82 million to $84 million, versus the previous estimate of $68 million to $70 million.
>
> The increased Non-GAAP diluted earnings per share and revenue guidance are primarily the result of increases in the Company's Zeus$^{IOPS}$ sales which now are estimated to exceed $55 million during the second quarter of 2009.
>
> The Company had previously estimated revenue from Zeus$^{IOPS}$ SSDs to surpass $65 million during the first half of 2009.  With this

increase in revenue, the Company now expects Zeus[IOPS] SSD sales to exceed $80 million during the first half of 2009.

39.     On July 16, 2009, STEC issued the following press release heralding the Company's $120 million supply agreement for its Zeus solid state drive and a corresponding increase in Zeus revenues:

> SANTA ANA, CALIF., July 16, 2009 — STEC, Inc. (Nasdaq: STEC), today announced that based on the Company's preliminary review of its anticipated financial performance, it is increasing its guidance for the second quarter of 2009.
>
> The Company expects to report Non-GAAP diluted earnings per share in the range of $0.32 to $0.36, versus the previous guidance of $0.20 to $0.22 per diluted share announced on May 11, 2009.
>
> The Company also expects to report revenue in the range of $82 million to $84 million, versus the previous estimate of $68 million to $70 million.
>
> The increased Non-GAAP diluted earnings per share and revenue guidance are primarily the result of increases in the Company's ZeusIOPS sales which now are estimated to exceed $55 million during the second quarter of 2009.
>
> The Company had previously estimated revenue from ZeusIOPS SSDs to surpass $65 million during the first half of 2009.  With this increase in revenue, the Company now expects ZeusIOPS SSD sales to exceed $80 million during the first half of 2009.

40.     On August 3, 2009 the Company issued another press release, also filed as an 8-K with the SEC, regarding its financial results for the second quarter of fiscal year 2009:

> SANTA   ANA,   Calif.,   Aug. 3,   2009   —   STEC,   Inc. (Nasdaq:STEC) announced today its financial results for the second quarter ended June 30, 2009.  Revenue for the second quarter of 2009 was $86.4 million, an increase of 53.7% from $56.2 million for the second quarter of 2008, and an increase of 35.9% from $63.5 million

14

for the first quarter of 2009.  Shipments of our ZeusIOPS Solid-State drives ("SSD") into the Enterprise-Storage market grew to $57.7 million for the second quarter of 2009, an increase of approximately 375% from $12.1 million for the second quarter of 2008, and an increase of approximately 125% from $25.7 million for the first quarter of 2009.

GAAP gross profit margin was 50.0% for the second quarter of 2009, compared to 32.3% for the second quarter of 2008 and 36.3% for the first quarter of 2009.  GAAP diluted earnings per share from continuing operations was $0.38 for the second quarter of 2009, compared to $0.03 for the second quarter of 2008, and $0.07 for the first quarter of 2009.

Non-GAAP gross profit margin increased to 50.1% for the second quarter of 2009, compared to 35.3% for the second quarter of 2008 and 39.8% for first quarter of 2009.  Non-GAAP diluted earnings per share from continuing operations was $0.42 for the second quarter of 2009, compared to $0.09 for the second quarter of 2008, and $0.17 for the first quarter of 2009.  GAAP results for the second quarter of 2009 included employee stock compensation, special charges related to the implementation of our restructuring plan and grant incentive income received from the Malaysian government.  Non-GAAP results are explained and reconciled to GAAP results in tables included in this release.

Additional highlights for the second quarter of 2009 include:

• signed a recently – announced $120 million contract to supply ZeusIOPS SSDs to a major Enterprise-Storage customer for the second half of 2009;

• signed a $28 million, 12-month contract to supply the ruggedized MACH8 SSD to a leading defense systems contractor, extending reach of one of our key product lines beyond the traditional storage market;

• accelerated adoption of the ZeusIOPS SSDs into major Enterprise-Storage and Enterprise-Server OEM customer, including IBM, Fujitsu, Compellent and HP;

• increased cash and cash equivalents, and short-term investments at the end of the second quarter of 2009 to approximately $94 million, a 49% increase from the end of the prior quarter;

• decreased inventory to approximately $38 million at the end of the second quarter of 2009, a 16% decrease from the end of the prior quarter; and

• successfully transitioned 100% of the Company's manufacturing from California to Malaysia.

**Business Outlook**

"It is exciting to share such outstanding results today and to deliver significant revenue, gross profit margin and EPS growth for the second quarter of 2009," said Manouch Moshayedi, STEC's Chairman and Chief Executive Officer. "We have shown a significant improvement in our already strong balance sheet – particularly in the generation of cash and effective management of inventory – added four more major Enterprise-Storage OEMs to our blue chip customer list, and surpassed our stated year-end 2009 non-GAAP gross profit margin goal of 40%, expanding it to 50% in the second quarter of 2009."

"In our prior quarter's earnings announcement we had estimated that Zeus$^{IOPS}$ revenue for the first half of 2009 would surpass $53 million. I am pleased to report that we have actually achieved $83 million in ZeusIOPS revenue for this period. Although we are still early in the process of the adoption of SSDs into the Enterprise-Storage market, I believe that the $120 million supply agreement that we signed for the second half of 2009 is a further indication of future SSD growth and customers' acceptance of SSDs into this growing market. I am very excited about our product road map – specific to the Enterprise-Storage, Enterprise-Server and related markets."

41. In addition, these results for the second quarter of 2009 were discussed in a conference call, also on August 3, 2009, including CFO Raymond Cook, and Defendant Manouch:

[RAYMOND COOK:]  We are very pleased to report our second quarter of 2009 net revenues of $86.4 million, surpassing our revised guidance of $82 million dollars to $84 million and up 36% over the first quarter of 2009.

Revenues from our signature Zeus$^{IOPS}$ SSDs was $57.7 million for the quarter and up 25% over Q109 revenue of $25.7 million.

For the Q209, revenue by product lines was follows.  Flash related products accounted for $76.6 million or 89% of our total revenues, a 37% sequential increase from $56.1 million in the first quarter of 2009.

DRAM related products accounted for $9.4 million or 11% of total revenue, an increase from $6.6 million in the first quarter of 2009, and service and other revenue was $0.4 million or 0.4% of total revenues.

**********

Our GAAP gross profit margin for the second quarter of 2009 was 50.0% compared to 36.3% for the first quarter of 2009.

Non-GAAP gross profit margin was 50.1% for the second quarter of 2009 versus 39.8% for the first quarter of 2009.  This increase was the result of our continued transition to flash related products primarily through our enterprise server SSD and enterprise storage SSD platforms in addition to lower manufacturing costs in Malaysia.

**********

Turning now to our guidance for the third quarter of calendar 2009, we expect our revenues to be in the range of $95 million to $97 million with diluted non-GAAP earnings per share in the range of $0.145to $0.47.

[MANOUCH MOSHEYEDI:]  We think on a go-forward basis on margins for ZeusIOPS will remain in the 50 to 60% area.  As you know, we have no competition at this stage.  In addition to that, we can hard drive manufactures in the enterprise area.  We're still making upwards of 40% margin in that business.  Going forward, if we have competition in the area of enterprise, moving to Malaysia, also the

capacity to be built in Malaysia and streamline all of the buildings. I think we will be able to maintain about the 50% margin for ZeusIOPS.

\*\*\*\*\*\*\*\*\*

[ANALYST:] Just along those lines, if you look at your biggest customer, 39% in the 10Q filing for Q2 and that's coming from 20% Q1, if you assume this biggest customer is driving basically all the ZeusIOPS, in terms of ZeusIOPS revenue, that would be roughly 49% of ZeusIOPS revenue in Q1 and 58% in Q2. What happens to this percentage in terms of ZeusIOPS as you go into the second half? I got to assume with more customers and newer customers that you gain in the first half starting to hit volume production in the second half that really this percentage for this biggest customer as a percentage of the total of ZeusIOPS business has to start coming back down a little bit? Would that be right?

[MANOUCH MOSHEYEDI:] Exactly. So, Gary, just to be clear, I think on the ZeusIOPS side that the other four customers that we have in this area, they have to come up and do the marketing and sales that the first customer is doing to get up to those sort of volumes. But going forward, I can't predict exactly if it's going to be next quarter or the quarter after. Everybody is working extremely hard getting SSD on enterprise storage devices. We're trying to devise new systems energy based only. So I think this is a very good indication of what could happen to our revenues going forward.

\*\*\*\*\*\*\*\*\*

[ANALYST:] Quick question on DMC, your largest customer. They made a comment on their earnings call about shipping close to a pedabyte, actually over a pedabyte, of flash related storage year-to-date. The conference call took place three weeks into the month of July. Obviously there's been a fairly steep ramp, particularly in light of, if we're guessing correctly, through that large supply contract you signed the second half of the year involves. How much, if we're thinking about that pedabyte shipped, was July a fairly big month for you guys in terms of shipments so far?

[MANOUCH MOSHEYEDI:] We think that ZeusIOPS sales from q-to-q is going to up about $10 million bucks from Q2 to Q3. So the ramp is right now about 20% rate on a quarterly basis. That's basically based on one customer in production, four customers are still in pre-production type of stage.

I think we will start seeing the ramp. One of our customers is in the middle of discussions in terms of M&A discussions. I think once that gets resolved, the customer will kick back in and start buying its original rate. The other three customers are very large and it takes them longer to get all the parts right.

So I think once these start kicking in, you will see huge ramps in sales of our ZeusIOPS going forward. I don't know if it's going to be next quarter or the quarter after, but it'll come sooner or later.

\*\*\*\*\*\*\*\*\*\*

[ANALYST:]   A couple of questions. First question on the model. Where do you guys, now that you've seen a big gross margin, 50%, and you're seeing this very strong mix of Zeus product. Where do you want people to think about gross margin trends here going forward as they look at their models?

[MANOUCH MOSHEYEDI:]   At this point, I don't want anybody thinking different than what we have already achieved. We are hoping that as the ZeusIOPS becomes a very large portion of our business and market IOPS kicks in, we will start getting a little better margin than we are getting today; however, we've already surpassed our long-term goal of 40/20. We are now doing 50/30 and we're happy with that.

So model-wise, I think we're going to keep that sort of a number going, within a range, and we'll update as things change.

\*\*\*\*\*\*\*\*\*\*

[ANALYST:]   If I'm looking at the math right with the 39% of revenue that you got from your largest customer be it maybe EMC will assume and what you're guiding I guess still reiterating the 220 in terms of Zeus revenue for the full year. Are you being relatively pretty conservative with regard to the ramp to the other customer opportunities, which I think last quarter you said would reach into full production in Q3?

[MANOUCH MOSHEYEDI:]   I think other customers are taking a little bit longer than expected in terms of full production. They're introducing the systems into the market. It looks like everybody is going through the same trials and tribulations that our first customer

went through in terms of sales and marketing side. So it's still I would say another quarter or two for ramp and production.

42.    In actuality, these statements failed to disclose that STEC had no basis for its business and revenue projections concerning IBM.  Contrary to STEC's publicly issued statements, IBM had not in fact begun to successfully implement SSD's into the market.  As a result, these statements were false and    misleading and they ignored the fact that sales of Zeus SSD's were materially less than the Company led investors to believe.

43.    Also on August 3, 2009, Defendants caused the Company to issue a Form 10-Q for the period ending June 30, 2009.  In their overview of the filing, Defendants stated the following regarding SSD projections:

> A major area of our Flash-based product investment has been focused on SSD technology. We believe the advantages of SSD technology are currently being defined in several distinct market segments; a) enterprise-storage applications, b) enterprise-server applications, c) military and industrial applications, d) PC mobile computing and consumer-related markets and e) video-on-demand ("VoD") applications. We see opportunities to leverage our SSD expertise across each of these markets where we believe our technology can outperform existing solutions. In addition, we believe the SSD market will continue to expand over the next few years as overall unit volume growth is expected, aided by the decline in Flash component pricing, which will serve to improve the comparative economics of Flash-based SSDs versus HDDs in both new and existing storage applications. We expect continued growth in the sales of our Flash-based SSD Zeus[IOPS] products through 2009 based on the accelerated adoption of our Zeus[IOPS] SSDs by most of our major enterprise-storage and enterprise-server OEM customers into their systems. As part of this expected growth, on July 16, 2009 we announced an agreement with one of our largest enterprise storage customers for sales of $120 million of Zeus[IOPS] SSDs in the second half of 2009.

44.    On August 5, 2009, STEC issued another press release, which was also filed as an 8-K with the SEC and which described an underwriting agreement with

J.P. Morgan Securities Inc. and Deutsche Bank Securities Inc. Pursuant to this agreement, Defendants Manouch and Merhdad sold 9 million of their personal shares of STEC's common stock at a price of $29.76 per share. This netted a final transaction price of $267.8 million prior to the deduction of offering expenses. This press release stated the following:

> On August 5, 2009, STEC, Inc. (the "Company") entered into an underwriting agreement (the "Underwriting Agreement") with J.P. Morgan Securities Inc. and Deutsche Bank Securities Inc., as representatives of the several underwriters named therein (the "Underwriters"), relating to the public offering and sale of 9,000,000 shares of the Company's common stock by Manouch Moshayedi, its chairman and chief executive officer, and Mark Moshayedi, its president, chief operating officer, chief technical officer, secretary and a director (together, the "Selling Shareholders"). Pursuant to the Underwriting Agreement, the Underwriters have agreed to purchase, subject to customary closing conditions, which will result in $267.8 million in net proceeds to the Selling Stockholders before deducting offering expenses. The sale of such shares is expected to close on August 11, 2009. The Selling Shareholders have also granted the Underwriters a 30-day option to purchase up to 1,350,000 additional shares of common stock on the same terms and conditions as set forth above, solely to cover over-allotments.

45.    These statements failed to disclose that the Rights Offering announced on August 5, 2009, amounted to insider trading by certain of the Individual Defendants. Through this offering, Manouch and Merhdad sold their personal holdings while in possession of material, adverse information and benefited from the fraudulent inflation in the Company's share price.

46.    On August 7, 2009 Defendants caused the Company to issue a Prospectus Supplement for the offering which stated:

> We believe that we are a technology leader in solid-state storage due to our nearly 20 years of focus on advanced memory solutions.

Throughout our history, we have delivered advanced memory and storage solutions to a wide range of customers in various market segments, and we continue to develop products to meet the need of enterprises to constantly improve the retention of, and access to, critical data at high performance levels.

**Our solutions**

The key features of our products include:

- *Proprietary controller IC technology.* In order to be first-to-market with innovative storage technologies, we design the fundamental logic for our SSD products.   The controllers within our various SSD products are the key to enabling high levels of performance and reliability.

- *High degree of customization.*  Products sold to our customers are typically customized by our design and engineering teams to meet our customers' specific design requirements.

- *High performance.*   Our SSD technology is optimized for exceptionally low-latency, fast access times, and sustained high megabyte-per-second speeds.

- *High Density.*   Our patented Stacking technology allows us to design and manufacture products in which multiple memory chips are Stacked vertically to increase the capacities without increasing the product footprint.  In some cases, our IC Tower and Postage Stame Stacking memory technology allows us to create a high capacity solution that is otherwise not currently available in the market using standard devices, and in other cases it allows us to provide the same capacity as a standard module at a lower price point.

- *Compact size.*  We are able to manufacture high-density products with some of the smallest form factors in the market in order to meet the ever-reducing size requirements of our customers' products.

- *High reliability.*  Our products are built utilizing sophisticated error detection and correction processes to provide high data reliability and integrity.   In addition, our products are designed to withstand high

levels of shock and vibration as well as extreme temperature fluctuations.

▪ *Low power consumption.* SSD products generally require less power than equivalent IOPs performance HDDs because fewer SSDs are required to achieve the same performance and SSDs do not contain moving parts.

47. On September 17, 2009, according to an article on *Forbes.com*, Wedbush Morgan Betsy Van Hees released a research note, stating that her industry sources had revealed information adverse to the Company—information that Defendants never shared with shareholders:

> Van Hees thinks the company could beat Q3 Street estimates, and says the company may spur higher estimates for Q4. But she also says that industry checks find that one of the company's Tier 1 enterprise customers "is in the final qualification stages" with Toshiba for SSDs. She writes that she had expected competitors to gain design wins, but didn't expect it to happen until the first half of 2010.

> Van Hees also writes that a leading hard-drive company is likely to introduce single-level cell and possible multi-level-cell SSDs in the fourth quarter. That would represent a change in the market, where to date most of the competition has been from NAND flash suppliers, including Toshiba, Samsung, Intel (INTC) and Micron (MU). "While the exact timing of the release is unclear, we believe the addition of an HDD supplier to the competitive landscape places increased pressure on STEC's ability to gain design wins in the enterprise SSD market."

48. On November 3, 2009, STEC issued a press release that was also filed as an 8-K with the SEC. The press release contained information that shocked investors as well as the markets, and read:

> SANTA ANA, Calif., November 3, 2009 — STEC, Inc. (Nasdaq:STEC) announced today its financial results for the third quarter ended September 30, 2009. Revenue for the third quarter of 2009 was $98.3 million, an increase of 54.3% from $63.7 million for

the third quarter of 2008, and an increase of 13.8% from $86.4 million for the second quarter of 2009. GAAP gross profit margin was 49.7% for the third quarter of 2009, compared to 32.1% for the third quarter of 2008 and 50.0% for the second quarter of 2009. GAAP diluted earnings per share from continuing operations was $0.47 for the third quarter of 2009, compared to $0.02 for the third quarter of 2008, and $0.38 for the second quarter of 2009.

* * * * * * * * * * * * * * * * * * * *

"I am very pleased to share with you, our exceptional results for the third quarter of 2009," said Manouch Moshayedi, STEC's Chairman and Chief Executive Officer. "Our solid operating results, the strengthening of our balance sheet and the further integration of our SSDs into our customers' platforms leave us in a great position to address the growth opportunities and challenges that lie ahead. Despite a sluggish economy, we believe our growth through the end of the year will continue.

One of our customers placed a $120 million supply agreement with us for shipments covering the second half of 2009. We recently received preliminary indications that our customer might carry inventory of our Zeus$^{IOPS}$ at the end of 2009 which they will use in 2010. In light of this development, we have jointly initiated a strategic sales and marketing incentive program designed to promote the integration of STEC's SSDs into their systems. As of September 30, 2009, we have accrued $1.5 million of estimated costs for this marketing incentive program. Both companies believe that we will be successful in increasing the pace of the replacement of HDDs with SSDs. If our marketing program is not successful in increasing the demand flow of SSDs, our first quarter of 2010 orders from this customer will be negatively affected; however, the actual impact cannot be quantified at this time."

49.     The statements in the press releases issued by STEC demonstrated that STEC had no basis for its business and revenue projections for Zeus, as the product was almost wholly reliant on one supply agreement with one customer for fully 90% of those projections.

50.     On November 4, 2009, the *Wall Street Journal* published an article on *Marketwatch.com* by Rex Crum entitled, "*STEC Shares Crushed as EMC Carries*

*Over Orders Into 2010.*" The article describes how STEC's share price rapidly fell following the November 3, 2009 press release:

> STEC, which makes solid-state drives [SSD] and other data-storage products, watched its shares fall more than $8.29 to $14.86 after the company said EMC Corp. would carry over its 2009 inventory into 2010. The move is seen as a potential blow to STEC's first-quarter earnings and sales next year.
>
> Wedbush analyst Betsy Van Hees wasted little time with her assessment of STEC's situation, cutting her rating on the company's stock to neutral from outperform and slashing her price target to $18 a share from $39 following STEC's disclosure about its EMC-related business.
>
> Van Hees said in a research note that STEC was "down for the count after last night's blindside knockout punch."
>
> STEC mentioned the EMC carry over late Tuesday as it reported its third-quarter results and gave a disappointing fourth-quarter outlook.

51.   Also on November 4, 2009, *TheStreet.com* published an article from The Associated Press entitled, "*Ahead of the Bell, STEC Shares Dive On Outlook.*" This article noted that the Company's shares fell drastically after the press release was issued on November 3, 2009, that the Company gave a weak outlook for the rest of the year, and that revenue forecasts for the rest of the year fell short:

> NEW YORK (AP) — Shares of Stec Inc. tumbled ahead of regular trading Wednesday after the company gave a weak outlook for the rest of the year and investors fretted about rising competition.
>
> Shares of the company, which makes data storage devices such as solid state drives, toppled $7.10, or 31 percent, to $16.05 in premarket trading.
>
> Stec reported a 20-fold increase in third-quarter profit late Tuesday, with revenue up by 54 percent to $98.3 million.

But the company's revenue forecast for the rest of the year fell short. It projected sales of $101 million to $103 million for the quarter ending in December.   Analysts polled by Thomson Reuters were looking for $106 million, on average.

Oppenheimer & Co. analyst Gary Hsueh cut his rating on the company's shares to "Perform" from "Outperform" in a note to clients Wednesday, warning of increasing competition next year.

He said the company is having trouble developing new business. And inventory is high at one customer, EMC Corp., which could lead to a "sizable downtick" in sales during the first quarter of 2010, Hsueh said.

52.    The actual impact of the revelations disseminated in the November 3, 2009 press release was profound.  The price of STEC's common stock decreased almost 39% from the closing price on November 3, 2009 of $23.15 to a demoralizing $14.14 per share at the closing bell on November 4, 2009.

53.    The nearly 39% plunge in STEC's stock price was directly caused by the disclosure of material information that the Company and Defendants had previously withheld, which yanked the inflated value from the shares.

54.    The long-term effects of the rapid share price decline are still being felt by the Company.  For example, an article in *The Register* (also cited by Yahoo! Finance) dated January 20, 2010, discussed the current status of STEC given its recent troubles:

The share price of EMC's favoured (*sic*) SSD supplier, STEC has grown almost 60 per cent since the beginning of the year, yet law suits are amassing and its competitive position has weakened. The rumour (*sic*) is that IBM interest in buying STEC is pushing its share price up.

In September last year STEC's share price peaked at $41.84. It was riding high and its management had made some significant share sales. Then it announced results that were solid enough, but less than

stellar, and said EMC had effectively over-ordered product and STEC wouldn't ship as much product as it had previously said.

The shares tanked, dropping to $21.32 by the end of October and then precipitously to $13.13 in early November. This reversal in investor sentiment was fuelled by a strengthening realisation (*sic*) that STEC's monopoly in Fibre Channel interface SSDs, the ones EMC favoured (*sic*), would not last forever and that server-located SSDs with PCIe interfaces were going to become popular. This was helped by energetic marketing and PR from Fusion-io, a PCIe interface SSD supplier.

Strengthening this concern was the entry of Seagate into the enterprise SSD space, the news that Micron and Intel had intentions in that market, the entry of SandForce and Pliant with strong controller offerings, and thoughts that Hitachi GST could produce a Fibre Channel interface SSD with Intel's help. SAS interface SSDs were also thought to be possible substitutes for Fibre Channel ones, especially with a 6Gbit/s SAS interface.

So STEC wasn't coining dollars as fast it had hoped, its effective monopoly faced sustained assault, and EMC wasn't taking as much product, yet its directors had sold shares as they rose to their peak. Shareholders, especially ones who had bought as STEC was ramping up to its $41.84 peak were furious. Law firms sniffed out class action possibilities - seven or more of these are now underway, claiming STEC directors effectively duped shareholders.

Shares reached a low point of $11.44 on December 7, 73 per cent down on their peak. Since then nothing in STEC's strategic situation has changed. No new design wins have been announced, although Fujitsu plumped for STEC on December 1 just before the bottoming out of the share price. No new product has been revealed, and no resumption of OEM order shipment growth rates have been announced...

The speculation and rumour (*sic*) is that IBM is interested in buying STEC. The logic seems pretty obvious with IBM getting control of the leading enterprise flash drive manufacturer, whose NAND product it is using in its SAN Volume Controller and disk drive arrays, and against a background of increasing SSD use in servers.

The big blue beast at Armonk has not spoken so this is all speculation, perhaps partly driven by burnt shareholders wistfully looking for a way to recoup their losses. Without the IBM interest the shares would appear to be over-valued…

55.     Beginning on June 16, 2009, Individual Defendants began a series of breaches of their fiduciary duties of care, good faith, and loyalty by filing false and misleading financial statements with the SEC, and disseminating these financial statements to the investing public.  These financial statements grossly inflated the Company's financial position, and assured the SEC and the investing public that the Company was being operated in a lawful and proper manner, in order to boost the Company's stock price.

## THE INDIVIDUAL DEFENDANTS' FALSE SEC CERTIFICATIONS

56.     Individual Defendants signed certifications pursuant to the SEC's Rules 13A-14 and 15D-14, adopted pursuant to Section 302 of the Sarbanes-Oxley Act (2002), as well as certifications pursuant to 18 U.S.C. § 1350.  These documents certified that: (a) Individual Defendants reviewed the Company's financial statements, (b) the reports did not contain any untrue statements of material fact, and (c) the financial statements fairly presented in all material respects the financial condition, results of operations, and cash flows of the Company.

57.     These certifications were false as the Company's financial statements contained untrue statements of material fact and omitted material adverse information concerning the Company's financial condition, results of operations, and future prospects.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

58.     Plaintiff brings this action derivatively in the right and for the benefit of STEC to redress injuries suffered, and to be suffered, by STEC as a direct result of the breaches of fiduciary duty, abuse of control, insider trading, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the

1  aiding and abetting thereof, by Individual Defendants.  STEC is named as a nominal
2  defendant solely in a derivative capacity.  This is not a collusive action to confer
3  jurisdiction in this Court that it would not otherwise have.

4       59.     Plaintiff will adequately and fairly represent the interests of STEC
5  and its shareholders in enforcing and prosecuting its rights.

6       60.     Plaintiff is the owner of STEC common stock and was the owner of
7  STEC common stock at all times relevant to the Individual Defendants' wrongful
8  course of conduct alleged herein.

9       61.     At the time that this action was commenced, the STEC Board
10  consisted of seven directors: Manouch, Bahri, Ball, Colpitts, Moses, Merhdad and
11  Witte.  As a result of the facts set forth herein, Plaintiff has not made any demand on
12  the STEC Board to institute this action against the Individual Defendants.  Such
13  demand would be a futile and useless act with respect to each Director Defendant
14  because they are incapable of making an independent and disinterested decision to
15  institute and vigorously prosecute this action for the following reasons:

16       a.     Defendants Manouch and Merhdad—aside from the fact that
17  they are brothers—face a substantial likelihood of being held liable for breaching
18  their fiduciary duties of loyalty and good faith for engaging in illegal insider trading
19  of STEC securities, and are therefore incapable of disinterestedly and independently
20  considering a demand to commence and vigorously prosecute this action having
21  participated in the following transactions:

22       (i)     During the Relevant Period, Defendant Manouch sold
23  approximately 4.1 million shares of STEC stock for proceeds of $127.5 million;

24       (ii)     During the Relevant Period, Defendant Merhdad sold
25  approximately 4.9 million shares of STEC stock for proceeds of $151.5 million; and

26       (iii)     As certain of the Individual Defendants received a
27  personal benefit from the challenged insider trading transactions, these Defendants
28  are interested.  Also, these Defendants face a substantial threat of liability for breach

of their fiduciary duties for insider selling. Since these Directors have breached their fiduciary duties and are interested, demand upon them is futile.

b.     Defendants Manouch, Bahri, Ball, Colpitts, Moses, Merhdad, and Witte knew of the Company's ongoing unlawful and improper business practices, and related improper accounting and revenue recognition practices, and thus face a substantial likelihood of being held liable for breaching their fiduciary duties, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

c.     Defendants Bahri, Ball and Witte knew of the Company's ongoing unlawful and improper business practices, and related improper accounting and revenue recognition practices, yet still permitted the Company to portray to the investing public the Company's false and misleading financial condition despite their heightened fiduciary obligations as members of the Audit Committee, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

d.     Defendants Ball, Bahri, Witte and Colpitts knew of the Company's ongoing unlawful and improper business practices, and related improper accounting and revenue recognition practices, yet still permitted the Company to portray to the investing public the Company's false and misleading financial condition despite their heightened fiduciary obligations as members of the Compensation Committee, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

e.     Defendants Manouch and Merhdad, because of their close familial relationships with each other, are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action against each other;

1       f.  The principal professional occupations of Defendants Manouch

2    and Merhdad are their employment with STEC, pursuant to which they received and

3    continue to receive substantial monetary compensations and other benefits.   For

4    Fiscal Year 2008, STEC paid Defendant Manouch $925,000 in salary and other

5    compensation and paid Defendant Merhdad $680,000 in salary and other

6    compensation. Accordingly, Defendants Manouch and Merhdad lack independence

7    from Defendants Ball, Bahri, Witte, and Colpitts as they are Defendants who are not

8    disinterested and/or independent and who exert influence over Defendants Manouch

9    and Merhdad's compensation by virtue of their positions as members of the

10   Compensation Committee.   The Compensation Committee annually reviews and

11   approves corporate goals and objectives relevant to Manouch and Merhdad's

12   compensation, evaluates their performance in light of those goals and objectives,

13   and approves their compensation level based upon these evaluations.   This lack of

14   independence renders Defendants Manouch and Merhdad incapable of impartially

15   considering a demand to commence and vigorously prosecute this action;

16      g.  STEC's   non-employee   directors   receive   substantial

17   compensation in the form of   cash and stock option awards.   Specifically, during

18   Fiscal Year 2008 STEC paid Defendant Bahri $74,548 and Defendant Ball $74.548.

19   Defendant Colpitts and Witte became non-employee directors in 2009. Defendant

20   Moses, currently a non-employee director, became the Chief Financial Officer in

21   2008, and in that same year received compensation of $540,586. Accordingly,

22   Defendants Bahri, Ball, Colpitts, Moses and Witte are interested in maintaining

23   their positions on the Board so as to safeguard their substantial compensation and

24   unvested stock options. Thus, demand upon these defendants is futile;

25      h.  The entire STEC Board and senior management participated in

26   the wrongs complained of herein.   STEC's directors are not disinterested or

27   independent due to the following: Defendants Manouch, Bahri, Ball, Colpitts,

28   Moses, Merhdad, and Witte served on the STEC Board during the Relevant Period.

Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs. Each of the above referenced Defendants breached the fiduciary duties they owed to STEC and its shareholders in that they failed to prevent and correct the improper financials. Thus, the STEC Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected STEC to millions of dollars in liability for possible violations of applicable securities laws;

i.      Defendants Manouch and Merhdad certified certain of STEC's SEC filings.   Accordingly, demand is futile as to either one as both face a substantial likelihood of liability for breach of fiduciary duties owed to STEC;

j.      Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein;

k.      STEC's Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from STEC's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

l.      In order to bring this suit, all of STEC's Directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

m.      The acts complained of constitute violations of the fiduciary duties owed by STEC's officers and directors and these acts are incapable of ratification;

n.      Each Individual Defendant authorized and/or permitted the false statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of

1  the false and misleading statements and are principal beneficiaries of the
2  wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit
3  even if such suit was instituted by them;

4         o.     Any suit by the current STEC Directors to remedy these wrongs
5  would likely expose the Individual Defendants and STEC to further violations of the
6  securities laws that would result in civil actions being filed against one or more of
7  the Individual Defendants, thus, they are hopelessly conflicted in making any
8  supposedly independent determination whether to sue themselves;

9         p.     STEC has been and will continue to be exposed to significant
10 losses due to the wrongdoing complained of herein, yet the Individual Defendants
11 have not filed any lawsuits against themselves or others who were responsible for
12 that wrongful conduct to attempt to recover for STEC any part of the damages
13 STEC suffered and will suffer thereby; and

14        q.     If the current directors were to bring this derivative action
15 against themselves, they would thereby expose their own misconduct, which
16 underlies allegations against them contained in class actions complaints for
17 violations of securities law, which admissions would impair their defense of the
18 class actions and greatly increase the probability of their personal liability in the
19 class actions, in an amount likely to be in excess of any insurance coverage
20 available to the Individual Defendants.  In essence, they would be forced to take
21 positions contrary to the defenses they will likely assert in the securities class
22 action.  This they will not do.

23        62.    Moreover, despite the Individual Defendants having knowledge of the
24 claims and causes of action raised by Plaintiff, the current Board has failed and
25 refused to seek to recover for STEC for any of the wrongdoing alleged by Plaintiff
26 herein.

27        63.    Plaintiff has not made any demand on STEC's shareholders to institute
28 this action since demand would be a futile and useless act for the following reasons:

a.   STEC is a publicly held company with over 50 million shares outstanding, and thousands of shareholders;

b.   Making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses of phone numbers of shareholders; and

c.   Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

64.   Furthermore, the conduct complained of herein could not have been the product of good faith business judgment, and each Director faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected STEC to substantial damages. Furthermore, Individual Defendants' conduct has subjected the Company to liability in connection with a securities fraud class action entitled, *In Re Stec, Inc. Securities Litigation*, No. 09-cv-01304-JVS-MLG, currently pending in the United States District Court for the Central District of California (the "Securities Action"). Through their intentional misconduct, Individual Defendants have subjected the Company to costs, fines, and judgments associated with the Securities Action. Such actions by the Individual Defendants cannot be protected by the business judgment rule. Accordingly, making a pre-suit demand on the Individual Defendants would be futile.

## COUNT I

### (Against All Defendants for Breach of Fiduciary Duty)

65.   Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

66.   Defendants owed a fiduciary duty to STEC to supervise the issuance of its press releases and public filings to ensure that they were truthful and accurate and that they conformed to federal and state securities law. Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of

1  STEC's internal controls and by allowing misleading statements and filings to be

2  issued and disseminated.

3      67.    Defendants have engaged, knowingly or recklessly, in a sustained and

4  systematic failure to exercise their oversight responsibilities and ensure that STEC

5  complied with federal and state laws, rules and regulations.

6      68.    As members of the STEC Board, the Individual Defendants were

7  directly responsible for authorizing or permitting the authorization of, or failing to

8  monitor, the practices which resulted in violations of state and federal laws, as

9  alleged herein.  Each of them had knowledge of and actively participated in and/or

10  approved of or acquiesced in the wrongdoings alleged herein or abdicated his/her

11  responsibilities with respect to these wrongdoings.  The alleged acts of wrongdoing

12  have subjected STEC to unreasonable risks of loss and expenses.

13      69.    Each of Defendants' acts in causing or permitting the Company to

14  disseminate to the investing public material misrepresentations and omissions and

15  abdicating his oversight responsibilities to the Company has subjected the Company

16  to liability for violations of federal and state law, and therefore were not the product

17  of a valid exercise of business judgment, constituting a complete abdication of their

18  duties as officers and/or directors of the Company.  As a result of Defendants'

19  breaches, STEC is the subject of a major securities fraud class action lawsuit by

20  defrauded investors, and has had its reputation in the business community and

21  financial markets irreparably tarnished.

22      70.    By reason of the foregoing, STEC was damaged.

23                    **COUNT II**

24      **(Against All Defendants for Gross Mismanagement)**

25      71.    Plaintiff incorporates by reference and realleges each of the foregoing

26  allegations as though fully set forth herein.

27

28

72.     Defendants had a duty to STEC and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of the Company.

73.     Defendants, by their actions and engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of STEC in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence, and candor in the management and administration of STEC's affairs and in the use and preservation of the Company's assets.

74.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused STEC to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to STEC, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged STEC.

75.     By reason of the foregoing, STEC was damaged.

## COUNT III

**(Against the Individual Defendants for Contribution and Indemnification)**

76.     Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

77.     STEC is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to defendants' liability to STEC.

78.     STEC's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of Defendants, and STEC is entitled to contribution and indemnification from each Defendant in connection with

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  all such claims that have been, are or may in the future be asserted against STEC, by

2  virtue of the Individual Defendants' misconduct.

### COUNT IV

**(Against Defendants Manouch and Merhdad for Breach of Fiduciary Duty**

**In Connection with Insider Stock Sales)**

6  79.    Plaintiff incorporates by reference all preceding and subsequent

7  paragraphs as if fully set forth herein.

8  80.    At the time of each of the stock sales set forth herein, Defendants

9  Manouch and Merhdad knew, but did not disclose publicly, that the Company's

10  financial results and press releases were false and misleading.   Manouch and

11  Merhdad made each of the stock sales described herein on the basis of, and because

12  of, their knowledge of the material non-public information described herein.

13  81.    At the time of their stock sales, Manouch and Merhdad knew that when

14  it was disclosed that the Company's financial results were false and misleading, the

15  price of the Company's common stock would drastically decline.   Their sales of

16  STEC common stock based on their knowledge of this material non-public

17  information constituted a breach of their fiduciary duties of loyalty and good faith.

18  82.    Since the use of the Company's proprietary information for their own

19  gain constitutes a breach of Defendants Manouch's and Merhdad's fiduciary duties,

20  the Company is entitled to the imposition of a constructive trust on any proceeds

21  that were obtained thereby.

### COUNT V

**(Against Defendants Manouch and Merhdad for Unjust Enrichment In**

**Connection With Insider Stock Sales)**

25  83.    Plaintiff incorporates by reference all preceding and subsequent

26  paragraphs as if fully set forth herein.

27  84.    Defendants Manouch and Merhdad were unjustly enriched by their

28  receipt of proceeds from their illegal sales of STEC common stock, as alleged

1   herein, and it would be unconscionable to allow them to retain the benefits of their

2   illegal conduct.

3       85.    To remedy Defendants Manouch's and Merhdad's unjust enrichment,

4   the Court should order them to disgorge to the Company all proceeds derived from

5   their illegal sales of STEC common stock.

## COUNT VI

### (Against Defendants Manouch and Merhdad for Misappropriation of
### Information In Connection With Insider Stock Sales)

9       86.    Plaintiff incorporates by reference all preceding and subsequent

10  paragraphs as if fully set forth herein.

11      87.    At the time of their stock sales, Defendants Manouch and Merhdad

12  knew that the Company's financial results were false and misleading as a result of

13  the Company's failure to comply with federal and state laws.  Their sales of STEC

14  common stock, while in possession and control of this material adverse nonpublic

15  information, was a breach of their fiduciary duties of good faith, honesty and

16  loyalty.

17      88.    Since the use of the Company's proprietary information for their own

18  gain constitutes a breach of the fiduciary owed by Defendants Manouch and

19  Merhdad to the Company, Plaintiff, on behalf of the Company, is entitled to the

20  imposition of a trust on any profits these Defendants obtained thereby.

## COUNT VII

### (Against All Individual Defendants for Abuse of Control)

23      89.    Plaintiff incorporates by reference all preceding and subsequent

24  paragraphs as if fully set forth herein.

25      90.    The Individual Defendants' conduct, as alleged herein, constituted an

26  abuse of their control over STEC.

27

28

91.   As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.

92.   Plaintiff has no adequate remedy at law.

## COUNT VIII

### (Against All Individual Defendants for Waste of Corporate Assets)

93.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

94.   Individual Defendants' conduct, as alleged herein, constituted a waste of corporate assets of STEC.

95.   As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which Individual Defendants are liable.

96.   Plaintiff has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.   Imposing a constructive trust in favor of the Company for the amount of proceeds that Defendants Manouch and Merhdad received from their sales of STEC common stock alleged herein, in addition to all proceeds otherwise derived from their service as directors and/or executives of the Company;

C.   Ordering Defendants Manouch and Merhdad to disgorge to the Company all proceeds derived from their sales of STEC common stock alleged herein, in addition to all proceeds otherwise derived from their service as directors and/or executives of the Company;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1      D.     Awarding to Plaintiff the costs and disbursements of the action,

2 including reasonable attorneys' fees, accountants' and experts' fees, costs, and

3 expenses; and

4      E.     Granting such other and further relief as the Court deems just and

5 proper.

**JURY DEMAND**

7     Plaintiff demands a trial by jury.

8 Dated: February 22, 2010       Respectfully submitted,

**GLANCY BINKOW & GOLDBERG LLP**

Michael Goldberg (SBN 188669)
1801 Avenue of the Stars, Suite 311
Los Angeles, CA  90067
info@glancylaw.com
Tele: (310) 201-9150
Fax: (310) 201-9160

**SAXENA WHITE P.A.**
Maya Saxena
msaxena@saxenawhite.com
Joseph E. White, III
jwhite@saxenawhite.com
Lester Hooker (SBN 241590)
lhooker@saxenawhite.com
2424 North Federal Highway, Suite 257
Boca Raton, Florida 33431
Tel: 561-394-3399
Fax: 561-394-3382

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

**ABBEY SPANIER RODD**
**& ABRAMS, LLP**
2
Nancy Kaboolian
212 East 39th Street
3
New York, New York 10016
Tele: (212) 889-3700
4
Fax: (212) 684-5191
5

6
*Attorneys for Plaintiff*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>VERIFICATION</u>

I, Emilio Gerov, verify that I have reviewed the STEC, Inc. Verified Complaint, and all the allegations contained therein. I do solemnly declare and affirm that the information contain therein concerning the Plaintiff is true to the best of my knowledge and understanding.

Emilio Gerov _____

Dated: _____

GLANCY BINKOW & GOLDBERG LLP
Michael Goldberg (SBN 188669)
1801 Avenue of the Stars, Suite 311
Los Angeles, CA  90067
Tele: (310) 201-9150
Fax: (310) 201-9160

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMILIO GEROV, Derivatively, on Behalf of Nominal Defendant STEC, INC., <br><br> PLAINTIFF(S) <br><br> v. <br><br> MANOUCH MOSHAYEDI, MERHDAD MOSHAYEDI, RAJAT BAHRI, F. MICHAEL BALL, CHRISTOPHER W. COLPITTS, DAN MOSES, MATTHEW WITTE, <br> Defendants, <br> and <br> STEC, INC., <br> Nominal Defendant. | CASE NUMBER <br><br> SACV10-00220-DOC (ANx) <br><br><br> **SUMMONS** |

TO:    DEFENDANT(S): MANOUCH MOSHAYEDI, MERHDAD MOSHAYEDI, RAJAT BAHRI,
       MICHAEL BALL, CHRISTOPHER W. COLPITTS, DAN MOSES, MATTHEW WITTE

   A lawsuit has been filed against you.

   Within  21  days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, Michael Goldberg , whose address is Glancy Binkow & Goldberg LLP, 1801 Ave. of the Stars, #311, Los Angeles, CA 90067 . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

                                        Clerk, U.S. District Court

Dated:  2 2 FEB 2010                    By: _____
                                            Deputy Clerk

                                            *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐)<br>EMILIO GEROV, Derivatively, on Behalf of Nominal Defendant STEC, INC., | DEFENDANTS<br>MANOUCH MOSHAYEDI, MEHRDAD MOSHAYEDI, RAJAT BAHRI, F.<br>MICHAEL BALL, CHRISTOPHER W. COLPITTS, DAN MOSES,<br>MATTHEW WITTE |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br><br>Michael Goldberg<br>Glancy Binkow & Goldberg LLP<br>1801 Ave of the Stars, Ste. 311, Los Angeles, CA 90067 T: 310.201.9150 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes ☐ No   ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. § 1332

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | ☐ 690 Other | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number: _SACV10~00220_____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:**  Have any cases been previously filed in this court that are related to the present case?  ☐ No   ☑ Yes
If yes, list case number(s):  Building Trades United Pension Trust Fund v. Moshayedi, et al, No. 10-cv-00667-SJO-AN

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☑ A.  Arise from the same or closely related transactions, happenings, or events; or
☑ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
☑ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Venezuela |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

**X. SIGNATURE OF ATTORNEY (OR PRO PER):**  _[signature]_          Date  February 22, 2010

Notice to Counsel/Parties:   The CV-71 (JS-44)  Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
but  is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program.  (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV10- 220 DOC (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [X] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.